J-A01019-25
J-A01020-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| N.E.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.Z.M. | : | No. 238 EDA 2024 |

Appeal from the Order Entered December 1, 2023
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2017-28078

| | | |
|---|---|---|
| N.E.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.Z.M. | : | No. 366 EDA 2024 |

Appeal from the Order Entered November 29, 2023
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2017-28078

| | | |
|---|---|---|
| N.E.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.Z.M. | : | |
| | : | |
| | : | No. 109 EDA 2024 |
| APPEAL OF: RICHARD DUCOTE | : | |

Appeal from the Order Entered November 29, 2023
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2017-28078

| | | |
|---|---|---|
| N.E.G. | : | IN THE SUPERIOR COURT OF |

J-A01019-25
J-A01020-25

|  |  |  |
|---|---|---|
|  | : | PENNSYLVANIA |
|  | : |  |
| v. | : |  |
|  | : |  |
|  | : |  |
| J.Z.M. | : |  |
|  | : |  |
|  | : | No. 237 EDA 2024 |
| APPEAL OF: RICHARD DUCOTE | : |  |

Appeal from the Order Entered December 1, 2023
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2017-28078

|  |  |  |
|---|---|---|
| N.E.G. | : | IN THE SUPERIOR COURT OF |
|  | : | PENNSYLVANIA |
|  | : |  |
| v. | : |  |
|  | : |  |
|  | : |  |
| J.Z.M. | : |  |
|  | : |  |
|  | : | No. 571 EDA 2024 |
| APPEAL OF: RICHARD DUCOTE | : |  |

Appeal from the Order Entered January 11, 2024
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2017-28078

BEFORE:  DUBOW, J., KING, J., and SULLIVAN, J.

MEMORANDUM PER CURIAM:                    **FILED JULY 8, 2025**

Appellants, N.E.G. ("Mother") and her attorney Richard Ducote, Esquire,

appeal from the orders entered in the Montgomery County Court of Common

Pleas filed November 29, 2023, December 1, 2023, and January 11, 2024,[1]

_____

[1] We have consolidated *sua sponte* the appeals taken by Attorney Ducote and
Mother, as they concern many of the same issues.  Attorney Ducote's appeal
at No. 109 EDA 2024, and Mother's appeal at No. 366 EDA 2024, are from the
*(Footnote Continued Next Page)*

- 2 -

entered in this custody matter between Mother and J.Z.M. ("Father"). We affirm in part, vacate in part, and quash in part.

The relevant facts and procedural history of these appeals are as follows. Mother initiated these custody proceedings on December 4, 2017, by filing a complaint for divorce/custody seeking custody of her and Father's three children, I.M. (born in August 2007), J.M.M. (born in August 2007), and J.M. (born in June 2011).[2]

On August 25, 2023, the trial court issued a rule to show cause for Mother's attorneys, Attorney Ducote and Joseph Rizzo, Esquire, concerning their non-compliance with various orders issued by the trial court, this Court, and our Supreme Court. On September 8, 2023, the court conducted a

_____

November 29, 2023 "gag order" entered by the trial court. Attorney Ducote's appeal at No. 237 EDA 2024, and Mother's appeal at No. 238 EDA 2024, are from the December 1, 2023 order that sanctioned Mother and Attorney Ducote for failing to comply with the November 29, 2023 gag order. Attorney Ducote's appeal at No. 571 EDA 2024 is from the January 11, 2024 order finding Attorney Ducote in contempt.

[2] The parties are well known to this Court. Since 2017, Mother has had 14 attorneys enter their appearance on her behalf—Attorney Ducote entered his appearance in May 2023. At least eight judges have been assigned to matters related to this case, including the trial court judge who presided over these matters to whom the case was reassigned in 2021. There have been over a dozen contempt petitions, and at least 10 Protection from Abuse ("PFA") petitions—none of which have resulted in a final PFA order. Mother has filed more than 17 appeals to this Court. This Court recently noted the following about Mother's actions: "She continues to press matters dismissed by one court only to recast and refile the same matters over again. Without a doubt, this course of conduct demonstrates a clear abuse of our judicial system and an unnecessary and very wasteful exhaustion of judicial resources." ***Gross o/b/o I.M. v. Mintz***, 321 A.3d 1005, 1012 (Pa.Super. 2024).

contempt hearing concerning Attorney Ducote and Attorney Rizzo.[3]

At the beginning of the hearing, the court summarized the following six issues identified by the court as the basis for the contempt proceeding:

Number 1, Attorneys Ducote's and Rizzo's failure to appear at the emergency custody hearing scheduled on June 21st, 2023, and held on July 17th, 2023.

Number 2, Mother's violation of the Mental Health Evaluation orders dated March 2nd, 2023, and July 28th, 2023;

Number 3, violations of the condition of this [c]ourt's order dated June 26th, 2023, and August 4th, 2023, granting Mother's petition for an *in camera* review of photos.

Number 4, [counsels'] direct communications and discussions with the party's minor children in violation of this [c]ourt's order dated June 21st, 2023.

Number 5, [counsels'] repeated attempts to attach documents to the docket in violation of this [c]ourt's order dated June 8th, 2023.

_____

[3] In its opinion, the trial court explained:

The conduct of Mother's counsel has been so egregious that this [c]ourt felt compelled to commence a contempt proceeding on its own motion. This is the first time that the undersigned has had to bring a contempt proceeding against counsel despite the fact that the undersigned has presided over thousands of cases as a judge. In her 14 years on the bench, the undersigned has never had a case that has risen to such an abhorrent level of conduct.

(Trial Court Opinion, dated 1/11/24, at 15). The trial court went on to state that the contempt hearing was brought by the court "to vindicate the dignity and authority of [the trial court] and the judicial system by sanctioning Mother's counsel for their disobedience of the [c]ourts' [o]rders and to compensate Father for the significant unnecessary legal fees he has been forced to incur due to [counsels'] contemptuous conduct." (*Id.* at 15-16).

And, number 6, [the various frivolous appeals filed on behalf of Mother by counsel].

(N.T. Contempt Hearing, 9/8/23, at 10). The court also explained that Mother had previously sought recusal of the trial judge, which the court had denied, and which this Court had quashed on appeal as interlocutory. (*See* Order, filed 7/10/23, at No. 1506 EDA 2023). Nevertheless, the court invited Mother to renew any recusal requests during the contempt proceedings once the testimony began. (*See* N.T. Contempt Hearing, 9/8/23, at 8). Thereafter, Attorney Ducote renewed his motion for recusal, alleging that the court had improperly pre-determined that Mother and her counsel were in contempt, prior to considering any of the evidence or argument presented at the hearing; Attorney Ducote made another recusal request later during the hearing. (*See id.* at 27, 37).

With respect to the specific allegations of contempt cited by the trial court above, the court first explained the details of Attorney Ducote and Rizzo's failure to appear at the July 17, 2023 custody hearing including: the court's June 21, 2023 scheduling order, Attorneys Ducote and Rizzo's unsuccessful attempts to continue the July 17, 2023 hearing, Mother's unsuccessful attempt to have this Court and our Supreme Court stay the hearing, and ultimately, Attorneys Ducote and Rizzo's failure to appear at the July 17, 2023 hearing. In response, Attorney Ducote insisted that he was unavailable for the hearing because of a previously scheduled hearing in

Louisiana.

With respect to the second allegation of contempt, the court explained that by agreed-upon order dated March 2, 2023, Mother and Father had agreed to submit to mental health evaluations. Mother unsuccessfully appealed the agreed-upon order, and the trial court issued another order dated July 28, 2023, directing Mother to comply with the March 2, 2023 order and to contact the mental health evaluator to set up an appointment. Attorney Ducote notified the court that Mother had scheduled an appointment for August 11, 2023; however, on the day of the scheduled appointment, he emailed the court advising that the evaluator rescheduled the appointment for August 17th. On August 16th, Attorney Ducote emailed the court stating that the evaluator had unilaterally cancelled Mother's evaluation. The court subsequently reached out to the evaluator, who provided a written explanation of his contact with Mother, stating that Mother had cancelled the first appointment, and the evaluator had cancelled the second appointment because Mother refused to comply with the terms and conditions of the evaluator's contract to conduct the psychological evaluation. Attorney Ducote denied any wrongdoing concerning Mother's failure to obtain the mental health evaluation. Attorney Ducote also refused to answer whether he was involved in Mother's failure to agree to the terms and conditions of the evaluator's contract.

Concerning the third allegation of contempt, the court explained that

Attorney Ducote was involved in the violation of the court's June 26, 2023 and August 4, 2023 orders regarding photographs of the parties' children that Mother sought to have admitted into evidence in the custody proceedings, which Mother claimed were pornographic in nature. The court's June 26, 2023 order directed Mother to authenticate the photographs, verify to which agencies and courts the photographs were submitted, and to provide the resultant court orders and the results of any investigations regarding the photos. After Mother did not provide the authentication or verification, the court issued a second order on August 4, 2023, reiterating the procedure for authentication and verification. Although Mother sent in a verification, the court found that it did not comport with the information required by the court for *in camera* review. Therefore, the court entered an order dated August 14, 2023, which precluded Mother from submitting the photographs in this custody matter or other proceedings. The court also explained that if Mother did so in willful contravention of the order, she and counsel would be subject to contempt. In response, Attorney Ducote argued that the court's orders were not lawful and that he had a responsibility to continue to offer the photographs into evidence.

Regarding the fourth allegation of contempt, the court explained that it had issued an order dated June 21, 2023, directing both parties and their counsel not to discuss the case with the parties' minor children. Thereafter, Mother filed an emergency petition for special relief which included depositions

and sworn statements taken of the parties' daughters at maternal grandmother's home which was orchestrated by Mother's counsel. In response, Attorney Ducote stated that he did not believe the court's order had prohibited him from taking children's deposition for the purpose of Mother's petition for special relief.

With respect to the fifth allegation of contempt, the court explained that it entered an order dated June 8, 2023, which forbade counsel from entering documents on the record that constitute self-serving allegations in a form not permitted by the rules of law and civil procedure. Thereafter, Mother's attorneys violated this prohibition by filing an improper document marked as miscellaneous, attaching improper filings to Mother's emergency petition for special relief, and filing improper documents marked as notices, all of which the court struck from the record. The court explained that the filings contained inadmissible depositions and sworn statements from the parties' daughters, and inadmissible letter opinions. Father's counsel noted that after the filings marked as notices were struck, Mother appealed to this Court, which quashed the appeal and cautioned that any further frivolous filings shall result in sanctions against the party and/or counsel. (*See* Order, filed 7/21/23 at No. 1755 EDA 2023).

Regarding the sixth and final allegation of contempt brought by the trial court, the court explained that in the previous six months in this case alone, Mother's attorneys filed seven appeals including, among other things, an

appeal of the March 2, 2023 agreed-upon order for a mental health evaluation and an appeal of the trial court's order denying Mother's petition for recusal of the trial court, which this Court had quashed as interlocutory. Similarly, the trial court reiterated language from this Court's order of July 21, 2023, quashing the appeal from the order striking the above-mentioned improper filings marked as notices as interlocutory, in which this Court had stated: "[t]he parties and their counsel are cautioned that any further frivolous filings in the above-captioned matter shall result in **sanctions** against the party and/or their counsel." (Order, filed 7/21/23, at No. 1755 EDA 2023) (emphasis in original). The trial court explained that after Mother filed an application for reconsideration of the July 21, 2023 order, this Court entered an order denying reconsideration and explaining that "[i]n light of [Mother's] filing of frivolous appeals and motions with this Court and this Court's warning [Mother] about filing frivolous motions in this matter, the Prothonotary of this Court is directed not to accept any further filings in the above-captioned appeal." (Order, filed 8/24/23, at No. 1755 EDA 2023).

After setting forth its basis for contempt, and hearing responses from both Attorneys Ducote and Rizzo, as well as Father's counsel, the court took the matter of contempt under advisement. It explained that counsel would have until September 14, 2023 to file any response and raise any objections, as well as to provide financial documents concerning their ability to pay any amounts assessed by the court. The court further stated that in order for both

Attorneys Ducote and Rizzo to have proper notice, it would hear the issue of Father's petition for attorneys' fees related to the contempts on a later date. Therefore, the court rescheduled the next hearing for November 27, 2023, where it intended to hear Father's request for attorney's fees, Father's petitions related to the contempt of Attorney Ducote, Attorney Rizzo, and Mother, and other various petitions that were pending at the time.[4]

At the start of the November 27, 2023 hearing, Attorney Ducote again insisted that the trial court judge was obligated to recuse herself, arguing that every order issued was illegal, unconstitutional and unethical. (**See** N.T. Contempt Hearing, 11/27/23, at 4). The court denied the request. (**See id.** at 14) (stating: "With regard to the recusal request, Mother's motion for recusal is denied. Counsel's request, again, in court today is denied and there will be no further requests for recusal to be entertained at this hearing"). Continuing with the hearing, the court read on the record the pleadings and orders upon which the contempt petition was brought by Father against Mother and her counsel, and which would be included in the contempt hearing.[5] (**See id.** at 24). During the hearing, Father's counsel raised an

_____

[4] At the beginning of the hearing, Father's counsel had explained that there were other issues of contempt that he raised in pleadings that he wanted to argue before the court as well.

[5] In addition to those contempt issues included in Father's pleadings, Father submitted an emergency petition for relief concerning an incident that occurred over the prior weekend wherein Father found child, I.M., hiding in a
*(Footnote Continued Next Page)*

issue concerning Attorney Ducote's past conduct in other cases and requested that the court issue a gag order in this case. (*See id.* at 81). Father cited a recent case, *S.B. v. S.S.*, 664 Pa. 1, 243 A.3d 90 (2020), *cert. denied*, ___ U.S. ___, 142 S.Ct. 313, 211 L.Ed.2d 148 (2021), wherein the Pennsylvania Supreme Court had recently upheld a gag order against Attorney Ducote. Father argued that in *S.B.*, Attorney Ducote, who was representing a different mother, exploited the child by publicly speaking about the details of the custody case to the press and social media. Although Father did not have any specific information concerning Attorney Ducote or Mother addressing the media, social media, or third parties about the details of the custody proceedings at issue here, Father preemptively requested a gag order so that such events would not be attempted or allowed by Mother and/or her counsel. (*See* N.T. Hearing, 11/27/23, at 82-84). In response to Father's request, the court stated that it would enter an interim order prohibiting the parties from disclosing "anything on social media, to the press, or anybody else at this time especially when we're dealing with children." (*Id.* at 87). The court explained that it needed more time to make an informed decision regarding the propriety of a final order, but until then, the court did not want anything disclosed. (*Id.*)

At the start of the second day of the hearing on November 28, 2023,

___

closet in his apartment holding a kitchen knife. The court heard testimony about the incident during the hearing. This incident, however, does not pertain to the appeal before us. (*See id.* at 7-8).

Father's counsel asked the trial court to revisit the interim gag order and requested that the court impose a final gag order before the close of the proceedings. (*See* N.T. Contempt Hearing, 11/28/23, at 3-4). The court heard from Attorney Ducote and then stated that it would take the issue under advisement. Later during the hearing, the court verified the identity of a woman in the gallery, Danielle Pollack, to ensure that she was not a witness.[6] (*Id.* at 25). At the close of the hearing on November 28, 2023, the court explained that the matter would be continued until the next available court date of January 9, 2024.

On the morning of November 29, 2023, in response to Father's November 27, 2023 oral motion, the court issued the following order ("gag order"):

> AND NOW, on this 29th day of November, 2023, upon consideration of [Father's] Counsel's oral motion made at a contempt hearing held on November 27, 2023 and November 28, 2023, and [Mother's] Counsel's oral objections raised in response thereto[1], it is hereby ORDERED and DECREED that [Father's] Counsel's oral motion is GRANTED as follows:
>
> [1] During argument at the hearing, in response to [Father's] counsel's question to [Mother's] counsel as to whether he and his client intended to speak publicly or communicate publicly about this case, [Mother's] counsel refused to directly answer the question.
>
> 1. Mother and her current counsel, Richard Ducote, Esq., and former counsel, Joseph Rizzo, Esq., ("Counsel") shall

---

[6] We discuss Ms. Pollack and her relevance to these proceedings in greater detail *infra*.

NOT speak publicly or communicate about this case including, but not limited to, print and broadcast media, online or web-based communications, or inviting the public to view existing online or web-based publications.

2. Mother and her Counsel shall NOT direct or encourage third parties to speak publicly or communicate about this case including, but not limited to print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications.

3. Mother and her Counsel may provide public testimony in the State House and/or Senate in the United States congress and Senate about parent alienation, sexual abuse of children in general or as it relates to this case. However, in providing such testimony, they shall NOT disclose any information that would identify or tend to identify the Children. Mother and her Counsel shall NOT [publicly] state Mother's name, Father's name or the Children's names. Mother and her Counsel shall not [publicly] refer to Mother, the Children or Father by name or in any matter that would tend to identify the aforementioned parties.

4. Mother and her Counsel shall remove information about this case, which may have been [publicly] posted by Mother and/or her Counsel, including but not limited to any press release, any press conference, any Drop Box information and any other online information accessible to the public within twenty-four (24) hours. Mother and her Counsel shall download or place the aforementioned information onto a thumb drive, which shall be physically delivered to this [c]ourt's chambers.

5. This Order does not prohibit any party or counsel from publicly speaking or expressing an opinion about the Judge, including disclosing the entry of this Order of Court, after the information has been removed as set forth above. However, such expression shall NOT contain the name of the Children or other information which would tend to identify the Children.

6. This Order is issued based upon this [c]ourt's conclusion that the restriction of the aforesaid speech furthers the important governmental interest of protecting the

psychological well-being and the privacy of the Children at the center of the custody dispute.[2]

> [2] *See* [*S.B., supra*.]

7. This Order shall be provided by Mother's current counsel, Attorney Ducote, [and] to Mother's former counsel, Attorney Rizzo.

(Trial Court Order (#740), 11/29/23, at 1-2).

Later that same day, the court issued a second order, explaining the following:

> After the issuance of the "gag order" by this [c]ourt filed at 8:54 a.m. on this date, the [c]ourt was made aware of a public posting made by Danielle Pollack on the public Facebook page for the National Safe Parents Organization. In this posting, Danielle Pollack, who had been present in the courtroom during the contempt hearing, cited the caption and docket number of this case. She also included a letter written by the parties' minor daughter, I.M. Ms. Pollack also included her own commentary reciting some of the allegations made in the child's letter against Father. This [c]ourt has repeatedly denied the admissibility of any such letters or statements made by the parties' two (2) minor daughters in this court proceeding and has repeatedly stricken any such documents that have been included as attachments to Mother's Counsel's filings in this proceeding.

(Trial Court Order (#744), 11/29/23, at 3). The trial court further found that "[t]he letter written by I.M. that has been posted could only have been provided to Danielle Pollack by Mother, her Counsel or a third party directed or encouraged by Mother or her Counsel to speak [publicly] or communicate about this case." (*Id.*) The court found that such communication was in direct violation of the gag order. The court therefore ordered Mother and her counsel to remove such postings within 24 hours, explaining that if the gag order was

not complied with, and the posting not removed, the trial court would sanction Mother and counsel $1,000.00 per day for every day they fail to comply with the order. The court continued that, "[t]he fact that the minor child's letter was provided to Danielle Pollack by Mother, her Counsel and/or a third party encouraged to do so by Mother or her Counsel and [publicly] posted requires this [c]ourt to take emergency action to prevent the exploitation of this child by Mother and her Counsel." (*Id.* at 4) (footnote omitted).

On November 30, 2023, Mother and Attorney Ducote filed a motion to vacate both November 29, 2023 orders (#740 and #744) and another request to recuse and disqualify the trial court judge. Father also filed an emergency petition on November 30, 2023, requesting a finding of contempt and sanctions against Mother and Attorney Ducote for their disobedience of the court's gag order, injunctive relief barring further proliferation of information regarding the present litigation, and an award of counsel fees in connection with the petition.[7]

_____

[7] In the petition, Father's counsel stated that he did a Google search of Danielle Pollack and the National Safe Parents Organization. That search navigated counsel to a Facebook page, where a Zoom meeting was being aired from Pittsburgh, chaired by Ms. Pollack. From the website, it appeared that the Zoom meeting took place that afternoon after the gag order had been filed by the court. (*See* Emergency Family Petition (#750), 11/30/23, at 4). Father's counsel stated that he viewed the Zoom proceedings, which were linked to in the Facebook posting, wherein Ms. Pollack referenced two children who had written statements and had come to the Zoom meeting prepared to read them publicly, but that the judge in the underlying case had entered a gag order making it impossible for the children to tell their stories. (*Id.* at 5). *(Footnote Continued Next Page)*

On December 1, 2023, the court issued an order (#756), in response to

Father's emergency petition, stating:

> AND NOW, on this 1st day of December, 2023, after the issuance of a gag order on November 29, 2023 (seq. #740), with an order (seq. #744) thereafter being issued directing that sanctions of $1,000 per day be assessed against Mother and her counsel for every day that I.M.'s letter is posted on social media and that the court is not provided with downloaded copies of any such postings; and Father having filed an Emergency Petition citing, among other things, such posting and violations of the gag order by Mother and her counsel; and this court having been made aware that the posting of I.M.'s letter is still on the Facebook page of Danielle Pollack as of the afternoon of December 1, 2023[1];
>
> > [1] Danielle Pollack was in the courtroom at the contempt hearing and the court has been made aware that she is associated with Mother and/or her counsel.
>
> 1. Mother and her counsel, Richard Ducote, Esq., are each sanctioned in the amount of $3,000 for the period through December 1, 2023, (being $1,000 per day for the period from 8:54 a.m. on 11/29/23 to 8:54 a.m. on 11/30/23, 8:54 a.m, on 11/30/23 to 8:54 a.m. on 12/1/23 and from 8:54 a.m. on 12/1/23 through the time of filing of this order, totaling 3 days times $1,000 each day). This amount in the total of $6,000 shall be made payable to the Montgomery Child Advocacy Project at 409 Cherry Street, Norristown, PA 19401 with delivery to their offices to be made within five (5) days from the date of entry of this Order. Failure to make timely payment shall subject Mother and her counsel to fines of $100 per day for every day that this amount is not paid.
>
> 2. Mother and her counsel are directed to comply with the November 29th Orders. Until such time as these orders are

---

Father suggested that the two children referred to by Ms. Pollock were, in fact, I.M. and J.M.M., and requested that the court enter sanctions against Mother and Attorney Ducote, injunctive relief, and attorney fees. (***Id.*** at 7-8).

complied with, sanctions shall continue to be assessed on a daily basis.

3. Father's counsel is granted $2,500 in legal fees for the preparation and filing of the Emergency Petition filed at seq. #750. This amount shall be paid by Mother by delivery to Father's counsel's office within five (5) days of [the] date of entry of this order or she shall be subject to contempt, sanctions and fines.

(Trial Court Order (#756), 12/1/23, at 1-2).

On December 27, 2023, Attorney Ducote filed a *pro se* notice of appeal from the November 29, 2023 gag order (#740), along with a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Attorney Ducote also filed a motion for stay pending appeal. On December 29, 2023, Attorney Ducote filed a *pro se* notice of appeal from the court's December 1, 2023 order, which found him in contempt of the gag order and imposed sanctions, along with a Rule 1925(b) statement.[8] Attorney Ducote also filed a motion for stay pending this appeal. The trial court granted the motion for stay in part and ordered that the amount of sanctions—$3,000.00 plus $100.00 in daily fines for every day the amount was not paid—was stayed upon the condition that Attorney Ducote post a cash or bond or other security with the prothonotary.

On December 29, 2023, Mother filed a *pro se* notice of appeal from the

_____

[8] Although Attorney Ducote initially stated that his appeals were children's fast track appeals, this Court removed that designation. (*See* Order, 1/12/24; Order, 2/21/24).

- 17 -

trial court's November 29, 2023 gag order (#740), along with a Rule 1925(b) concise statement. On December 31, 2023, Mother filed a *pro se* notice of appeal from the court's December 1, 2023 order, which found her in contempt of the gag order and imposed sanctions, along with a Rule 1925(b) statement.

On January 9th and 10th, 2024, the trial court held the continuation of the contempt hearing. On January 11, 2024, the trial court issued findings of fact concerning Attorneys Ducote and Rizzo's pre-September 8, 2023 contempt. Specifically, the court found that 1) Attorneys Ducote and Rizzo understood the court orders requiring their appearance at a July 17, 2023 proceeding and still refused to obey the court's order and failed to appear at the hearing; 2) Attorneys Ducote and Rizzo were aware of the court's order directing Mother to comply with a mental health evaluation and orchestrated Mother disobeying the order; 3) Attorneys Ducote and Rizzo willfully and intentionally refused to direct Mother to comply with various court orders directing her to cease attempting to introduce as evidence various photographs of the parties' children without complying with the court's direction to verify the nature and origin of the photographs; 4) Attorneys Ducote and Rizzo communicated with the minor children and took sworn depositions of the children despite the trial court's order directing counsel not to communicate with the children; and 5) Attorneys Ducote and Rizzo were aware of the court's order directing counsel to cease attempting to file documents on the docket by mischaracterizing the nature of the filings, and

- 18 -

nevertheless refused to obey the court's order and continued to submit the filings. (*See* Trial Court Opinion, dated 1/11/24, at 2-15). The court found that this willful refusal to comply with the court's orders constituted indirect criminal contempt. Therefore, the court imposed sanctions against Attorney Ducote in the amount of $12,000.00. With respect to attorney's fees, the trial court found that "the fees incurred that are attributable to the contemptuous conduct of Attorney Richard Ducote amount to $45,162." (*Id.* at 23). The court explained that Attorney Ducote may purge himself from the $12,000.00 sanctions by payment of the total award of counsel fees within 30 days of the date of the order. (Trial Court Order, dated 1/11/24, at 3).

On February 9, 2024, Attorney Ducote timely filed a notice of appeal from the trial court's January 11, 2024 order.[9] On February 14, 2024, the trial court ordered Attorney Ducote to file a Rule 1925(b) statement, which Attorney Ducote filed on March 4, 2024.

At docket No. 109 EDA 2024, Attorney Ducote raises the following issues:

> 1) Was Judge Wall's recusal required based on the motions she denied prior to the issuance of the "gag order," when the recusal motions established her bias, prejudice, and unfairness, and raised a substantial doubt as to the judge's ability to preside impartially?

_____

[9] Attorney Rizzo also appealed from the January 11, 2024 order, docketed in this Court at No. 611 EDA 2024. On May 6, 2025, this Court affirmed the order, holding that Attorney Rizzo's issues were waived on appeal based on a non-compliant Rule 1925(b) statement. *See N.E.G. v. J.Z.M.*, No. 611 EDA 2024 (Pa.Super. filed May 6, 2025) (unpublished memorandum).

- 19 -

2) Could the trial court lawfully enter the appealed "gag order" in the form of a permanent injunction against Appellant counsel where no pleadings were filed seeking such an order, no opportunity was provided counsel to challenge the order, no hearing was held regarding the order, no evidence or record was adduced establishing the basis for the order, and the "gag order" was simply cut and pasted from that issued in *S.B. v. S.S.* against Appellant counsel Ducote?

(Attorney Ducote's Brief at 9-10).

At docket No. 237 EDA 2024, Attorney Ducote raises the following issues:

1. Was Judge Wall's recusal required based on the motions she denied prior to the issuance of the December 1, 2023, contempt order when the recusal motions established her bias, prejudice, and unfairness, and raised a substantial doubt as to the judge's ability to preside impartially?

2. Did the trial court misapply the law and abuse its discretion in entering *sua sponte* and *ex parte* the November 29, 2023, "emergency" Order [(#744)] finding a "violation" of the "gag order" issued earlier that same day, based on something the court was supposedly "made aware of" and ordering [Attorney Ducote] to remove certain postings and physically deliver to Judge Wall a thumb drive with a downloaded Facebook posting over which neither counsel or his client had any control or access, and entering a priori $1,000/day sanctions against [Attorney Ducote], without any due process having been provided, and where Judge Wall's only basis to enter the order were wholesale speculations clearly based on improper *ex parte* communications or investigations prohibited by Rule 2.9, Pa. Code of Judicial Conduct?

3. Did the trial court misapply the law and abuse its discretion in adjudging [Attorney] Ducote in contempt of court based on supposed violations of the November 29, 2023, "gag order," then sanctioning [Attorney] Ducote $1000/day for a three-day period, and then continuing to

- 20 -

impose sanctions at $100/day until "I.M.'s letter" is removed from a certain website, when a) the December 1, 2023, contempt/sanctions order was summarily issued *sua sponte* by Judge Wall in violation of all due process mandates, with no motion filed, no notice issued, and no hearing held; 2) absolutely no evidence exists that [Attorney] Ducote had any control over what was on the website; and 3) the order was based only on Judge Wall's representation that she was "made aware" of some alleged violation of the "gag order," which in no way constitutes any form of admissible evidence, but is, instead, a stark violation of Rule 2.9, Pa. Code of Judicial Conduct?

(Attorney Ducote's Brief at 25-26).

At docket No. 571 EDA 2024, Attorney Ducote raises the following issues:

1. Was Judge Wall's recusal required based on the motions she denied prior to the issuance of the January 11, 2024, contempt order when the recusal motions established her bias, prejudice, and unfairness, and raised a substantial doubt as to the judge's ability to preside impartially, especially considering her serving simultaneously as the prosecutor, complaining witness, and judge?

2. Was [Attorney] Ducote denied his due process right to notice of the contempt allegations against him prior to the September 8, 2023, hearing on which the Order is based?

3. Were any of the supposed acts of contempt upon which the Order proved beyond a reasonable doubt at the September 8, 2023, hearing?

(Attorney Ducote's Brief at 34-35).

At docket No. 238 EDA 2024, Mother raises the following issues on appeal:

1. Did the trial court err and abuse its discretion by entering an order for sanctions that violated [Mother's] state and federal due process rights to notice and the opportunity to

- 21 -

be heard in a fair hearing before an impartial judge, because no pleadings were filed seeking the Order, no hearing was ever held to grant the Order, no admissible evidence was ever presented, and no factual or legal basis existed to support the Order?

2. Did the trial court err and abuse its discretion by entering an order for sanctions when [Mother] was never given the opportunity to oppose the Order, and the trial court wholly relied on hearsay, illegal and unethical *ex parte* communications in violation of Rule 2.9, Code of Judicial Conduct, false speculation, rumor, false allegations, and a priori hostility and prejudice toward Appellant Mother?

3. Did the trial court err and abuse its discretion when it imposed sanctions and awarded attorney's fees without first conducting a hearing on the matters and then without conducting a hearing on the validity and reasonableness of the sanctions and fees?

(Mother's Brief at 6).

At docket No. 366 EDA 2024, Mother raises the following issues on appeal:

1. Did the trial court err and abuse its discretion in entering a "gag order" injunction against [Mother] violating her state and federal due process rights to notice and the opportunity to be heard in a fair hearing before an impartial judge, because no pleadings were filed seeking such, and neither [Mother] nor counsel was ever given the opportunity to oppose the Order (seq # 740)?

2. Did the trial court err and abuse its discretion in entering the interim order granting full legal custody to [Father] without a hearing based on lies from Father-Appellee's counsel especially when the child had disclosed to his court ordered therapist that he didn't want to go with Father because Father was taking pictures of his penis in public restrooms?

(Mother's Brief at 32).[10]

For purposes of disposition, we will discuss Mother and Attorney Ducote's issues together where appropriate. The first issue pertinent to our discussion is Attorney Ducote and Mother's claims that the trial court judge should have recused herself from the instant matter.[11] Attorney Ducote avers that the trial court judge erred in denying the plethora of motions to recuse that he has filed on Mother's behalf. Attorney Ducote argues that there is "clear and indisputable proof" of the judge's bias and prejudice toward Mother and her counsel, claiming that throughout the litigation, the judge ruled against Mother prior to considering the evidence. Mother similarly contends

_____

[10] Mother's second issue at No. 366 EDA 2024 concerns an interim custody order entered by the trial court on September 27, 2023. "It is well-ensconced in Pennsylvania that an interim custody order is not appealable." ***J.M. v. K.W.***, 164 A.3d 1260, 1263 (Pa.Super. 2017) (citation omitted). Thus, we will not consider this specific issue for lack of jurisdiction. Moreover, both the notice of appeal at No. 366 EDA 2024 and Mother's concise statement at that docket concern only the court's gag order entered on November 29, 2023. It is well-settled that to be preserved for review, all issues must be included in the Rule 1925(b) concise statement. Because Mother's issue regarding the interim custody order was not included in her concise statement, this issue would be waived on appeal in any event. ***See Commonwealth v. Lord***, 553 Pa. 415, 418, 719 A.2d 306, 308 (1998).

[11] Attorney Ducote presented this as his first issue in each appeal before us. Although Mother also complains that the trial judge should have recused herself, Mother did not present this specific issue in her statement of questions involved. (***See*** Mother's Brief at 6). Mother's failure to include this issue in her statement of questions presented could arguably deem her issue waived on appeal for failure to comply with the Rules of Appellate Procedure. ***See*** Pa.R.A.P. 2116, 2101. Nevertheless, based on our disposition of this issue, we decline to deem Mother's issue waived on this ground.

that the trial judge should have recused herself based on evidence of her ability to preside impartially. Mother insists that the trial judge has issued rulings and made decisions prior to considering Mother's evidence, and that she has refused to consider evidence that is relevant to the custody determination. Attorney Ducote and Mother conclude that the trial judge erred in denying the recusal motions, and this Court must grant relief. We disagree.

As a preliminary matter, "the appealability of an order directly implicates the jurisdiction of the court asked to review the order." *Knopick v. Boyle*, 189 A.3d 432, 436 (Pa.Super. 2018) (internal citation omitted). Under Pennsylvania law:

> An appeal may be taken from: (1) a final order or an order certified as a final order (Pa.R.A.P. 341); (2) an interlocutory order as of right (Pa.R.A.P. 311); (3) an interlocutory order by permission (Pa.R.A.P. 312, 1311, 42 Pa.C.S.A. § 702(b)); or (4) a collateral order (Pa.R.A.P. 313).
>
> A final order is one that disposes of all the parties and all the claims ... or is entered as a final order pursuant to the trial court's determination.

*Veloric v. Doe*, 123 A.3d 781, 784 (Pa.Super. 2015) (internal citations and quotation marks omitted).

Generally, an order ruling on a motion for recusal is an interlocutory order. *In re Bridgeport Fire Litigation*, 51 A.3d 224, 229 (Pa.Super. 2012). "[T]his Court has indicated that an appeal from a denial of a pre-trial motion to recuse … is not an interlocutory or collateral order that is immediately appealable." *Krieg v. Krieg*, 743 A.2d 509, 511 (Pa.Super. 1999) (stating:

"This Court has held that … a pre-trial motion seeking to recuse a judge from further proceedings is not a final order"). ***See also*** (Order, filed 7/10/23, at No. 1506 EDA 2023) (specifically informing parties to this litigation of same). Only when the underlying action has been decided, does the court's decision become a final appealable order. ***See K.H. v. J.R.***, 573 Pa. 481, 493, 826 A.2d 863, 871 (2003) (explaining that final order at conclusion of proceedings triggers appealability of earlier non-final orders).

Here, Mother and Attorney Ducote have advanced numerous recusal requests throughout the life of this case and the multitude of proceedings. Nevertheless, the underlying custody matter is ongoing, and no final order has been entered concerning custody. Thus, any appeal challenging the denial of recusal is interlocutory at this juncture. ***See Krieg, supra***. Furthermore, neither Attorney Ducote nor Mother have set forth any other basis to establish this Court's jurisdiction (*i.e.*, such as pursuant to the collateral order doctrine) to invoke our jurisdiction over this issue. Therefore, we quash the portion of Attorney Ducote and Mother's appeals that purport to appeal from the denial of their recusal requests.[12]

_____

[12] We further note that on September 12, 2024, the trial judge issued an order recusing herself. (***See*** Trial Court Order, dated 9/12/24). In the order, the court explained that "the recent publicity initiated by Mother's counsel" Attorney Ducote, wherein "misrepresentations were disseminated to the public thereby creating an illusion that a controversy exists between Attorney Ducote and the undersigned" may have caused a "false public misperception … that may give the appearance of impropriety and cast doubt upon this
*(Footnote Continued Next Page)*

Next, we turn to Mother and Attorney Ducote's claim that the November 29, 2023 gag order (#740) constitutes an illegal infringement on their First Amendment rights, and that the gag order constituted a permanent injunction in violation of their due process rights without providing notice or an opportunity to be heard. Attorney Ducote argues that the trial court erred and abused its discretion in *sua sponte* issuing the November 29, 2023 gag order. Attorney Ducote insists the court violated his due process rights in entering the order, where no pleadings were filed seeking such an order and the court did not conduct a hearing or provide him with the opportunity to contest the order. Attorney Ducote claims that the gag order constitutes a permanent injunction, and the court abused its discretion in failing to provide the constitutional protections required prior to issuance of a permanent injunction. Attorney Ducote acknowledges that speech restrictions can be lawfully imposed to avoid harm to a child; nevertheless, Attorney Ducote asserts that to impose such restrictions, the restricted speech must actually harm the child. Attorney Ducote complains that the gag order was not supported by the record, such that this Court must vacate the order.

Likewise, Mother argues that the November 29, 2023 gag order (#740)

_____

[c]ourt's ability to maintain impartiality in any future proceedings." (***Id.***) Accordingly, in the exercise of discretion and in good faith, recognizing that the circumstances could engender the appearance of impropriety, the trial judge voluntarily recused herself from the custody case and any further proceedings in this matter. (***Id.***)

was improperly entered without a predicate pleading filed, without notice or an opportunity for Mother to contest it, and without any evidentiary record supporting entry of the gag order. Mother claims the gag order was essentially a permanent injunction, such that she was entitled to a full hearing in which the court could consider whether an injunction was warranted. Mother avers that the trial court imposed the gag order in this case simply because Attorney Ducote, who had a nearly identical gag order entered against him in an unrelated case, was counsel for Mother in the instant matter. Mother concludes that there were no relevant facts in this case to support entry of the gag order, and this Court must grant relief.[13] We disagree.

We first consider Mother and Attorney Ducote's First Amendment claim. A First Amendment challenge to a gag order presents a question of law, "for which our standard of review is *de novo* and our scope of review is plenary." **S.B., supra** at 23, 243 A.3d at 104. In such cases, "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." ***Id.*** (quotation marks and citations omitted). In reviewing First Amendment challenges, we must consider both the nature of the at-issue speech restriction, as well as its scope, as follows:

---

[13] The trial court's November 29, 2023 gag order, which restricts the parties from speaking publicly about certain aspects of the case, is a form of injunction, immediately appealable pursuant Rule 311. **See** Pa.R.A.P. 311(a)(4) (discussing appealability of orders granting injunction).

- 27 -

It is well-established that content-based restrictions on speech are presumptively unconstitutional and are subject to the strict scrutiny standard, which requires the government to prove that the restrictions are narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). "Government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed." *Id.*

Determining whether a particular restriction on speech is content based or content neutral is not always a simple endeavor. A restriction is content based if either the face of the regulation or the purpose of the regulation is based upon the message the speaker is conveying. *Reed,*[*supra*] at 163-64, 135 S.Ct. 2218. …

To the contrary, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys.* [*v. F.C.C.*], 512 U.S. [622,] 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 [(1994)] (internal citation omitted). A content-neutral regulation of speech passes constitutional muster if it satisfies the following four-part standard set forth by the High Court in *United States v. O'Brien*, [391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)]: (1) the regulation was promulgated within the constitutional power of government; (2) the regulation furthers an important or substantial governmental interest; (3) the government interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *O'Brien, supra* at 377, 88 S.Ct. 1673.

So long as the regulation of speech is not a means, subtle or otherwise, of exercising content preference, it is not presumed invalid. *See Turner Broad. Sys., supra* (deeming the challenged statute content neutral because the face of the statute distinguishes between speakers in the television programming market based only on the manner in which the programmers transmit their messages to viewers, not the content of the messages they carry, and

the purpose for which the statute was enacted is also unrelated to content).

Restrictions on the time, place and manner of expression, whether oral, written or symbolized by conduct, are a form of a content-neutral regulation of speech. ***Clark v. Community for Creative Non-Violence***, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). These restrictions may make it more difficult for an individual to engage in a desired speech-related activity by targeting, *inter alia*, the means of speech or the method of communication, but they do not target the content of the message ultimately conveyed. Time, place, and manner restrictions are valid, provided that they: (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant governmental interest unrelated to speech;[12] and (3) leave open ample alternative channels for communication of the information. ***Id.***

> [12] The United States Supreme Court has clarified that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." ***Ward v. Rock Against Racism***, 491 U.S. [781,] 798[, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)].

The High Court has explained that "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." ***Ward***[*, supra*] at 791, 109 S.Ct. 2746 (internal citation omitted). The government's purpose of the speech restriction is the controlling consideration and, if the purpose is unrelated to the expression of content, the restriction is deemed neutral, even though the speech restriction may have an incidental effect on some speakers or messages, but not others. ***Id.***

While the precise text of the two constitutional standards differ (*i.e.*, the ***O'Brien*** standard employed to determine whether a regulation of speech is content neutral and the

> specific standard applicable to time, place, and manner restrictions on speech), the High Court has clarified that the **O'Brien** standard "is little, if any, different from the standard applied to time, place, or manner restrictions." **Community for Creative Non-Violence**, 468 U.S. at 298, 104 S.Ct. 3065.

**S.B., supra** at 25-27, 243 A.3d at 104-06 (some internal citations omitted).

In **S.B., supra**, our Supreme Court considered the constitutionality of a gag order in a child custody case. The gag order in question forbade the mother and her attorneys from speaking publicly or communicating about the case including "print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications." **Id.** at 12, 243 A.3d at 97. The gag order also: ordered that the mother and her attorneys shall not direct or engage third parties to speak publicly about the case; provided that they may provide public testimony concerning parent alienation, sexual abuse of children in general, however, they shall not disclose any information that would identify the child; and finally, that mother and counsel shall remove information about the case that had been publicly posted. **Id.** The Supreme Court concluded that when "read in its entirety, the order constitutes a content-neutral restriction on the manner by which [a]ppellants may convey their public speech, which was imposed for the exclusive purpose of protecting the psychological well-being and privacy of [c]hild, and was not intended to, and, indeed, does not restrict [a]ppellants' message." **Id.** at 27, 243 A.3d at 106. The Court rejected the appellants' contention that the gag order constituted a ban on all speech,

pointing out that the order included "additional provisions expressly permitting public speech relating to Child's custody proceeding if conveyed in a particular manner." *Id.* at 28, 243 A.3d at 106. The gag order further provided that appellants may "provide public testimony in the State House and/or Senate and in the United States Congress and Senate about parent alienation, sexual abuse of children in general or as it relates to this case, so long as their speech is not conveyed in a manner that would identify the child." *Id.* (internal quotation marks omitted).

Ultimately, the *S.B.* Court held that that gag order did not silence the appellants from expressing their views on important issues relating to the custody proceeding. Instead, it permitted appellants ample opportunity to disseminate their thoughts without restriction on the content of the message. It further permitted appellants "to voice all of their opinions regarding issues important to them, including parental alienation, child sexual abuse, and placement of children in the custody of sexually abusive parents, and to testify about these issues before governmental bodies in an effort to remedy these vital societal concerns." *Id.* at 28, 243 A.3d at 107. The order further permitted speech related to the entry of the gag order itself and speech criticizing the trial court's judgment in issuing the order. "The only limitation on [the a]ppellants' speech lies in the manner of communication, as they are precluded from conveying such public speech in a way that exposes [c]hild's identity and subjects him to harm." *Id.* at 28-29, 243 A.3d at 107. Therefore,

the **S.B.** Court held that the gag order was content neutral and targeted only the method of communication for the purpose of protecting the child. As such, the court found that the intermediate standard of constitutional scrutiny set forth in **O'Brien** applied.

Here, similar to the gag order considered in **S.B., supra**, the gag order entered in this case did not silence Mother or her attorneys from expressing their views on issues related to the custody proceeding, from expressing their opinions on the propriety of the gag order or about the court's judgment in issuing the order, and did not impact Mother or her attorneys' rights to voice their opinions regarding parental alienation, child sexual abuse, and placement of children in the custody of sexually abusive parents. In fact, the other specifically permitted Mother and her attorneys to testify about these issues before governmental bodies. Although the court's order prohibited Mother and her counsel from publicly discussing the details of this case or the parties or children's names, these restrictions concern only the method that Mother and her counsel use to express their opinions and are ultimately content neutral restrictions. Therefore, we conclude that November 29, 2023 gag order (#740) was a time, place and manner restriction, and a content-neutral regulation of speech; consequently, the intermediate standard of constitutional scrutiny set forth in **O'Brien** applies. **See S.B., supra**.

Applying the **O'Brien** factors here, we first consider whether imposition of a gag order in a custody case is within the constitutional power of the

government.  *See O'Brien, supra*.  In *S.B.*, our Supreme Court made clear that protecting the interests of a child subject to a custody determination is within the constitutional power of the judiciary.  *See S.B., supra*.  Likewise, as the court's order here is designed to protect the interests of a child, the first factor is satisfied.  *See O'Brien, supra*.

Under the second and third factors of *O'Brien*, the restriction must further an important governmental interest and whether that governmental interest is unrelated to the suppression of free expression.  It is well settled that protecting a minor's well-being from psychological and physical harm serves a compelling state interest.  *See S.B., supra* at 30, 243 A.3d at 108 (citing *Sable Communications of Cal v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)).  *See also D.P. v. G.J.P.*, 636 Pa. 574, 146 A.3d 204 (2016) (explaining that state has compelling interest in safeguarding children from various kinds of physical and emotional harm and promoting their well[-]being); *Hiller v. Fausey*, 588 Pa. 342, 904 A.2d 875 (2006) (providing that compelling state interest at issue in this case is state's longstanding interest in protecting health and emotional welfare of children).

Next, we must discern whether the governmental interest at stake here is unrelated to the suppression of speech.  *See O'Brien, supra*.  Here, the court entered the order to protect the parties' children from exploitation and to ensure that Mother and Attorney Ducote did not attempt to go public with the details of the case.  The trial court considered the history of the case and

the inexhaustive efforts by Mother to involve the Children in her custody battle. Specifically, the court noted the efforts by Mother and her counsel to distribute the letter written by I.M. to anyone they could find to read it, including the guardians *ad litem* for the children. On this record, we agree that the restriction was in furtherance of the substantial government interest in protecting the well-being of the Children in this case, which was unrelated to the expression of free speech. ***See O'Brien, supra***.

The last factor of the ***O'Brien*** test analyzes whether the restriction is narrowly-tailored to advance the important governmental interest at stake while imposing no restriction greater than that essential to the furtherance of that interest. ***See O'Brien, supra***. As this court noted in ***S.B.***, the restriction must be narrowly-tailored, but need not be the least restrictive or least intrusive means of achieving its goal. ***See S.B., supra*** at 27 n.12, 243 A.3d at 105 n.12. In ***S.B.***, our Supreme Court found that the gag order in question was narrowly-tailored to advance the government interest while imposing no greater unnecessary restrictions where the order specifically carved out opportunities for the appellants to speak on the overall issue of domestic violence and child abuse, while still protecting the privacy of the child involved in the custody proceeding.

Here, the language of the gag order mirrors that of the gag order in ***S.B.*** Specifically, the order forbids Mother and her counsel from speaking publicly about the case and from encouraging third parties from speaking publicly

about the case. However, it expressly provides that Mother and her counsel may provide testimony in the State house or Senate or in the United States Congress and Senate about these issues, as long as they do not disclose information that would identify or tend to identify Children. The order also expressly permitted the parties to express an opinion about the Judge, as long as such expression does not contain the name of the Children.

Upon review, we conclude that the gag order satisfies the intermediate standard of constitutional scrutiny set forth in *O'Brien* applicable to restrictions placed on the time, place, and manner of speech. We further conclude that the November 29, 2023 gag order (#740) is narrowly-tailored to advance the important governmental interest at stake, protecting the well-being of Children, while imposing no restriction greater than that essential to the furtherance of that interest. *See O'Brien, supra*. Consequently, Attorney Ducote and Mother's First Amendment claims fail.[14]

---

[14] On January 2, 2025, and January 3, 2025, this Court granted Attorney Ducote and Mother's requests to supplement their briefs to rely on and cite to our Supreme Court's recent holding in *Oberholzer v. Galapo*, ___ Pa. ___, 322 A.3d 153 (2024). In *Oberholzer*, our Supreme Court considered whether "signs decrying hatred and racism, placed by a Jewish family on their own lawn after a neighbor called one of them a 'fucking Jew,' were properly enjoined by the trial court." *Oberholzer, supra* at ___, 322 A.3d at 158. Specifically, the trial court had granted in part the Oberholzers' request for a permanent injunction, directing that the Galapos were required to direct their anti-racist and anti-hate signs away from the Oberholzers' home.

In analyzing whether the trial court imposed an unconstitutional prior restraint under Article I, Section 7 of the Pennsylvania Constitution, the Court held:
*(Footnote Continued Next Page)*

_____

> [A]lthough trial courts generally lack the power to enjoin speech under Article I, Section 7, because freedom of speech is not absolute and residents may legitimately expect the highest degree of privacy known to our society when inside their homes, and enjoy the right to require a degree of quietude which is consistent with the standard of comfort prevailing in the locality wherein they live, courts may enjoin pure speech occurring in the residential context upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.

*Id.* at ___, 322 A.3d at 187 (internal citations and quotation marks omitted). Ultimately, however, the Court decided that it was unconvinced that the posted signs intolerably intruded upon the Oberholzers' privacy interests. Thus, the Court held that Article I, Section 7 and this Court's precedents precluded the trial court from enjoining the signs, and the court's injunction imposed an improper prior restraint on speech in violation of Article I, Section 7.

Attorney Ducote and Mother appear to rely on Justice Wecht's dissenting opinion in ***Oberholzer***, in which Justice Wecht stated that the majority "extends unwarranted protection to the Galapos' speech, notwithstanding its recent denial of basic speech rights to the appellant mother in [***S.B., supra***]." ***Oberholzer, supra*** at ___, n.17, 322 A.3d at 195 n.17 (Wecht, J., dissenting). Justice Wecht opined that "[r]eaders will search in vain for a governing principle that can harmonize or reconcile these two majority opinions." ***Id.***

At the outset, we are not bound by a dissenting opinion. Further, the majority in ***Oberholzer*** made clear that "Article I, Section 7 has its own rich, independent history, and this Court has repeatedly determined that it affords greater protection for speech and conduct than does the First Amendment." ***Id.*** at ___, 322 A.3d at 173. In rejecting Justice Wecht's dissent, the majority noted that Justice Wecht appeared to ignore such critical differences. Thus, the majority stated that it was "unwilling to disregard or overrule that long line of historical cases[.]" ***Id.*** at ___, n.22, 322 A.3d at 187, n.22.

We see no reason to depart from our High Court's thorough First Amendment analysis in ***S.B.***, the facts of which are squarely on point with those at issue

*(Footnote Continued Next Page)*

We next address Mother and Attorney Ducote's arguments that the court violated their due process rights in imposing the gag order without notice or an opportunity for them to respond.[15] Our well-settled standard of review of a trial court's decision to enter an injunction is as follows:

> The grant or denial of a permanent injunction is a question of law. Regarding the trial court's legal determination, our standard of review is *de novo*, and our scope of review is plenary. As in all equity matters, however, we must accept the trial court's factual findings and give them the weight of a jury verdict where they are supported by competent evidence.

***Dovin v. Honey Brook Golf Club L.P.***, 325 A.3d 1282, 1292 (Pa.Super. 2024) (internal citation omitted).

Pennsylvania Rule of Civil Procedure 1531 governs special relief in the form of injunctions and provides as follows:

### Rule 1531. Special Relief. Injunctions

(a) A court shall issue a preliminary or special injunction only after written notice and hearing unless it appears to the satisfaction of the court that immediate and irreparable injury will be sustained before notice can be given or a hearing held, in which case the court may issue a preliminary or special injunction without a hearing or without notice. In determining whether a preliminary or special injunction should be granted and whether notice or a hearing should be required, the court may act on the basis of the averments of the pleadings or petition and may

---

here, in favor of any of the language on which Attorney Ducote and Mother rely in ***Oberholzer***.

[15] Neither Mother nor Attorney Ducote argue that the court failed to establish the requirements necessary to impose an injunction. Rather, both focus on the alleged due process violation based on a lack of notice and opportunity to be heard. (***See*** Attorney Ducote's Brief at 28-30; Mother's Brief at 36-40).

> consider affidavits of parties or third persons or any other proof which the court may require.

Pa.R.C.P. 1531(a). Generally, an injunction shall be issued only after written notice and a hearing; however, "[a] preliminary injunction may be granted without notice and a hearing … when there exists a need for unusual haste so that a clear right may be protected from immediate and irreparable injury." **WPNT Inc. v. Secret Commc'n Inc.**, 661 A.2d 409, 411 (Pa.Super. 1995). "This [C]ourt has acknowledged that there is no absolute right to a hearing on a preliminary injunction." **Id.**

"To justify the award of a permanent injunction, the party seeking relief must establish that his right to relief is clear, that an injunction is necessary to avoid an injury that cannot be compensated by damages, and that greater injury will result from refusing rather than granting the relief requested." **Kuznik v. Westmoreland Cnty. Bd. of Comm'rs**, 588 Pa. 95, 117, 902 A.2d 476, 489 (2006) (internal quotation marks and citation omitted).

Instantly, at the start of the November 27, 2023 hearing, Father's counsel made an oral motion seeking entry of a gag order against Mother and her counsel. In this oral motion, Father's counsel explained Attorney Ducote's actions in **S.B.** and expressed his concern that Attorney Ducote may act similarly in the instant case. Father's counsel asked Attorney Ducote whether he intended to go public about the instant case, and Attorney Ducote refused to answer. (**See** N.T. Contempt Hearing, 11/27/23, at 74). Under these circumstances, the trial court entered an interim order directing that Mother

and her counsel "were not to disclose anything on social media, to the press, or anybody else at this time, especially when we're dealing with children." (**See id.** at 87).

Father's counsel renewed the motion for a gag order on November 28, 2023, during the second day of the hearing. The court explained that it would enter a written gag order in the form of a permanent injunction, but the interim order would ensure that there was no public disclosure. Furthermore, as the court explained:

> Attorney Ducote was provided an opportunity to respond to the oral motion. Besides his specious argument that the oral motion was procedurally improper, Attorney Ducote objected to the issuance of a gag order based upon his arguments that this custody matter is "public" and that a gag order would violate his first amendment rights. He also referred to such a request as "nonsense".

(Trial Court Opinion, 3/13/24, Opinion 2, at 6) (citing N.T. Contempt Hearing, 11/27/23, at 84; N.T. Contempt Hearing, 11/28/23, at 4).

Upon review, we conclude that the trial court did not abuse its discretion when it issued a preliminary injunction, followed by a permanent injunction in the form of the gag order. Contrary to Mother and Attorney Ducote's claims, the record reveals that both Mother and Attorney Ducote were given notice of the request for an injunction, and provided an opportunity to be heard, not only on the first day of the hearing when the preliminary injunction was given, but also on the second day. Neither Attorney Ducote nor Mother has articulated any argument concerning the three-part requirements for a

permanent injunction. ***See Kuznik, supra***. Therefore, Mother and Attorney Ducote's due process challenge to the trial court's imposition of the November 29, 2023 gag order fails.

We turn next to the issue of the trial court's December 1, 2023 order that found Mother and Attorney Ducote in contempt of the court's November 29, 2023 orders based on a Facebook posting related to the case that was made by Danielle Pollack.[16] Attorney Ducote insists that the trial court erred in finding him in contempt and imposing monetary sanctions in the absence of any party filing a motion or notice seeking such relief, a hearing, or evidence that Attorney Ducote had control over the Facebook posting. Attorney Ducote concludes the court's December 1, 2023 order must be vacated on these grounds.

Mother also argues that the trial court erred in imposing the December 1, 2023 contempt order. First, she contends that the court erred because it based its finding of contempt on an *ex parte* communication, wherein the court would not disclose how it found out about Danielle Pollack's Facebook posting. In addition, Mother contends that the court erred in conducting an independent investigation of the contempt. Furthermore, Mother claims the

---

[16] Although Attorney Ducote included a challenge to the court's authority to enter the second November 29, 2023 order (#744) in his statement of questions presented, his argument relates only to the December 1, 2023 order finding him in contempt. Thus, we conclude that Attorney Ducote waived any claims related to the entry of the second November 29, 2023 order (#744). ***See*** Pa.R.A.P. 2119(a) (discussing required content of argument sections).

court erred when it issued the December 1, 2023 order finding her in contempt without holding a hearing or providing an opportunity for Mother to respond to the contempt allegation, or to offer argument about the validity and reasonableness of sanctions and fees. We are constrained to agree.

A contempt order that imposes sanctions is immediately appealable. *J.M. v. K.W.*, 164 A.3d 1260, 1264 (Pa.Super. 2017) (stating "it is beyond cavil that a finding of contempt is final and appealable when a sanction is imposed"). This Court has stated:

> When a trial court adjudges someone in contempt of a custody order, five procedural elements are recommended to ensure due process: "(1) a rule to show cause why attachment should issue; (2) an answer and hearing; (3) a rule absolute; (4) a hearing on the contempt citation; and (5) an adjudication." *Harcar v. Harcar*, 982 A.2d 1230, 1234-35 (Pa.Super. 2009). However, all five factors are not mandatory. *Id.* The "essential due process requisites for a finding of civil contempt are notice and an opportunity to be heard." *Id.*

*E.K. v. J.R.A.*, 237 A.3d 509, 526-27 (Pa.Super. 2020).

Instantly, the trial court *sua sponte* found Mother and Attorney Ducote in contempt of the November 29, 2023 gag order (#740). The court did not provide a rule to show cause, did not permit Mother and Attorney Ducote to answer, did not issue a rule absolute, and did not hold a hearing on the contempt citation. *See id.* Although the parties clearly had notice of the requirements set forth in the gag order, they did not have notice of the contempt citation, and did not have any opportunity to be heard prior to the court's adjudication. Because Mother and Attorney Ducote were not provided

notice that they were facing a possible contempt finding, nor the opportunity to be heard, we conclude that the trial court violated their right to due process. *See id.* Accordingly, we vacate the December 1, 2023 contempt order.

Finally, we turn to Attorney Ducote's issues concerning the trial court's January 11, 2024 order, which found Attorney Ducote and Attorney Rizzo in contempt based on their pre-September 8, 2023 violation of court orders. Attorney Ducote argues that the contempt order and sanctions must be vacated both because he had no notice of the contempt allegations against him, and because none of the allegations of contempt were proven. Of the six filings of contempt, Attorney Ducote claims that only the first, failing to appear at the July 17, 2023 hearing, was properly noticed. With respect to that claim, Attorney Ducote argues that given his prior commitment to a trial in Louisiana, and his motion for a continuance, the court erred by finding him in contempt for failure to appear at the hearing. With respect to the remaining findings of contempt, Attorney Ducote baldly argues that notice was not provided, that the court orders of which he was allegedly in contempt were not definite, clear and specific, and that the trial court lacked authority to impose sanctions for frivolous appeals to this Court because such sanctions may only be imposed by this Court. We disagree.[17]

_____

[17] The January 11, 2024 order finding Attorney Ducote and Attorney Rizzo in contempt is immediately appealable because the court imposed sanctions. *See J.M., supra*.

Our standard of review concerning a trial court's contempt ruling is as follows:

> This Court's review of a civil contempt order is limited to a determination of whether the trial court abused its discretion. If a trial court, in reaching its conclusion, overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record, then discretion is abused.

**B.A.W. v. T.L.W.**, 230 A.3d 402, 406 (Pa.Super. 2020) (citation omitted).

> "The court abuses its discretion if it misapplies the law or exercises its discretion in a manner lacking reason." [**Harcar, supra** at 1234]. "Each court is the exclusive judge of contempts against its process. The contempt power is essential to the preservation of the court's authority and prevents the administration of justice from falling into disrepute." **Habjan v. Habjan**, 73 A.3d 630, 637 (Pa.Super. 2013). Absent an error of law or an abuse of discretion, we will not disrupt a finding of civil contempt if the record supports the court's findings. **Mrozek v. James**, 780 A.2d 670, 673 (Pa.Super. 2001).

**Thomas v. Thomas**, 194 A.3d 220, 225-26 (Pa.Super. 2018).

Initially, we note that the trial court found Attorney Ducote in "civil and indirect criminal contempt due to [his] disobedience of the lawful process of the [c]ourt, along with civil contempt based upon [his] frivolous, dilatory, obdurate, vexatious and arbitrary conduct and bad faith actions taken in this custody proceeding." (Trial Court Opinion, 1/11/24, at 15).

"Criminal contempt may be classified as either direct or indirect." **In Int. of E.O.**, 195 A.3d 583, 586 (Pa.Super. 2018). "A charge of indirect

criminal contempt consists of a claim that a violation of an order or decree of court occurred outside the presence of the court." *Id.* (citation omitted).

> To establish a claim of indirect criminal contempt, the evidence must be sufficient to establish the following four elements:
>
> (1) the order in question must be definite, clear, specific and leave no doubt or uncertainty in the mind of the person to whom it was addressed of the conduct prohibited; (2) the contemnor must have had notice of the specific order or decree; (3) the act constituting the violation must have been volitional; and (4) the contemnor must have acted with wrongful intent.

*Id.* at 587 (citation omitted). "Our Supreme Court has long recognized that the power to impose punishment for criminal contempt is not derived from legislation, but is a right inherent in courts and is incidental to the grant of judicial power under Article 5 of our Constitution." *In re Davis*, 302 A.3d 166, 186 (Pa.Super. 2023) (citation and internal quotation marks omitted).

> "To sustain a finding of civil contempt, the complainant must prove certain distinct elements by a preponderance of the evidence: (1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent." *P.H.D. v. R.R.D.*, 56 A.3d 702, 706 n.7 (Pa.Super. 2012) (citation omitted). Moreover, "[a] court may exercise its civil contempt power to enforce compliance with its orders for the benefit of the party in whose favor the order runs but not to inflict punishment. A party must have violated a court order to be found in civil contempt." *Garr v. Peters*, 773 A.2d 183, 189 (Pa.Super. 2001) (citation omitted).

*Gross v. Mintz*, 284 A.3d 479, 489 (Pa.Super. 2022), *appeal denied*, ___ Pa. ___, 293 A.3d 563 (2023).

"The imposition of counsel fees can serve as a sanction upon a finding of civil contempt." [***Sutch v. Roxborough Memorial Hospital***, 142 A.3d 23, 69 (Pa.Super. 2016), *appeal denied*, 640 Pa. 378, 163 A.3d 399 (2016)]; ***Rhoades v. Pryce***, 874 A.2d 148, 152 (Pa.Super. 2005), *appeal denied*, 587 Pa. 724, 899 A.2d 1124 (2006).  The purpose of awarding counsel fees in this context is "to reimburse an innocent litigant for the expenses the conduct of an opponent makes necessary, such as the cost of the contempt hearing, so it can be coercive and compensatory but it cannot be punitive." ***Sutch, supra*** at 69.  We review an award of contempt sanctions in the form of counsel fees for an abuse of discretion. ***Mrozek, supra*** at 674.

***Thomas, supra*** at 26 (footnote omitted).

Here, as the trial court explained:

This contempt proceeding was commenced by the filing of a Rule to Show Cause ("Rule") by the [c]ourt, which was served on counsel through the Prothonotary.  The Rule set forth the basis for the relief sought, either in the body of the Rule itself, or by the listing of the Pleading/Order docket sequences at the top of the Rule in which counsel's contemptuous conduct was addressed.  While Mother's counsel claim that they were not provided proper notice of the contemptuous behavior upon which the proceeding was brought, such a claim is incredible.  It is beyond cavil that two (2) attorneys who consider themselves as extremely experienced practitioners could feign that they did not know what violations and conduct would be presented against them at the contempt hearing….

The Rule gave Mother's counsel an opportunity to file an Answer to the claims of contemptuous and frivolous conduct and a hearing date at which they could appear to provide any defenses to the contempt charges.  They were also directed to provide the Court with their financial information if they wanted their respective financial ability to pay counsel fees and/or sanctions to be considered by the court.  The only Answer that was filed was by Attorney Ducote, which contained no meritorious defenses.  Neither attorney provided any of their financial information.  In accordance with the foregoing, Mother's counsel were afforded

procedural due process.

(Trial Court Opinion, 1/11/24, at 16).

In its Rule 1925(a) opinion, the trial court explained that its findings of contempt pertained only to counsels' contemptuous conduct that occurred prior to the September 8, 2023 hearing date, which included, but were not limited to the following:

1. Counsel willfully refused and failed to appear for an emergency custody hearing scheduled for July 17, 2023, after being denied a stay of the hearing by this [c]ourt, [the] Superior Court of Pennsylvania and the Pennsylvania Supreme Court.[7]

[7] **See** Orders dated June 21, 2023 (seq. #474), July 6, 2023 (seq. #500), and July 10, 2023 (seq. #517) issued by [the trial court]; Superior Court Order dated July 14, 2023 under docket number 109 EDA 2023; and Pennsylvania Supreme Court Order dated July 15, 2023 under docket number 83 MM 2023.

2. Counsel willfully and intentionally refused to advise and direct Mother to comply with a mental health evaluation ordered by this [c]ourt, which Order was appealed by Mother with her appeal being quashed.[8] To date, Mother has refused to submit to a mental health evaluation, with her conduct being supported and condoned by her Counsel.[9]

[8] **See**, Superior Court docket number 743 EDA 2023.

[9] **See** Order dated October 6, 2023. Mother's counsel advised her to cross-out standard provisions in the evaluators' engagement contracts claiming the provisions were unlawful.

3. Counsel demanded that various photographs of the parties' children, which Mother claimed supported her unfounded allegations of sexual abuse by Father, be found admissible by this [c]ourt. However, Mother and her Counsel refused to comply with the conditions prescribed by

this [c]ourt in Orders dated June 26, 2023, and August 4, 2023, that were required prior to Mother's submission of the photographs to the [c]ourt for *in camera* review.[10] As a result of their failure to comply with these conditions, the photographs were precluded by Court Order dated August 14, 2023 (seq. #552). Mother and her Counsel appealed this Order, which appeal was quashed by Superior Court Order filed on August 24, 2023, at docket number 2016 EDA 2023. This [c]ourt has repeatedly stated on the record that any further attempts to have the photographs admitted into the record through testimony and/or by exhibit would be deemed willful contempt. Despite the numerous admonishments, Counsel and his client have repeatedly violated the Court's directives in this regard.

[10] Since 2017, Mother has brought such photographs to the Office of Children and Youth, various police departments and numerous other governmental agencies in an attempt to support her claims of sexual abuse by Father of their children. NO agency to date has found her claims credible. Yet, Mother continues to persistently use and exploit the parties' children in pursuit of her baseless claims of sexual abuse by Father by putting them through continual interviews with various agencies.

4. Counsel violated Court Orders directing them not to communicate with the parties' children by taking unauthorized depositions of the parties' two (2) oldest daughters and trying on numerous occasions to file the deposition transcripts as exhibits to petitions/motions filed on the docket in an attempt to make the transcripts part of the court record. Additionally, a civil complaint was filed by Mother on behalf of one (1) of the parties' daughters against Father with Attorney Ducote representing Mother and the daughter, which further violated the Order not to communicate with the children.[11]

[11] *See*, Docket #2023-16648.

5. As part of the above cited course of conduct, there is a letter written by one (1) of the parties' daughters, I.M., which Mother and her Counsel have desperately tried to make part of the record in this custody proceeding in any

manner possible, *i.e.* filing it as a stand-alone document on the docket, annexing it to pleadings as an exhibit and including it as an exhibit with Pre-Trial Memorandum filed on the docket. In fact, Counsel AGAIN attempted to admit the letter into the record at the pending contempt hearing, to which Father's counsel objected with the objection being sustained by this [c]ourt. ([N.T. Contempt Hearing, 11/27/23, at 83-85]). While this [c]ourt has denied all attempts by Mother and her Counsel to improperly insert this hearsay document into the record, there have been significant concerns by Father and his counsel, along with the concerns of this [c]ourt, as to Mother and her Counsel's exploitation of the minor daughter by use of this letter.[12]

> [12] The undersigned has not read the letter and does not know the content of the same.

(Trial Court Opinion, dated 3/13/24, at 3-5).

With respect to the first finding of contempt (which is the only one specifically addressed by Attorney Ducote in his brief), we conclude that the trial court's findings are supported by the record, and the court did not abuse its discretion in finding Attorney Ducote in contempt. The trial court's six-page August 25, 2023 Rule to Show Cause thoroughly set forth the allegations of contempt that the court intended to bring against Attorney Ducote. (*See* Rule to Show Cause, 8/25/23). In addition, at the commencement of the hearing, the trial court detailed the orders that it alleged counsel had violated and how it alleged counsel had done so. The multi-day hearing commenced in November 2023, and the court did not issue its findings of fact and order finding counsel in contempt until January 2024. During this period, Attorney Ducote was afforded both notice of the allegations of contempt against him, as well as the opportunity to respond to the contempt both by filing a written

response and orally during the hearings. Thus, we agree with the trial court that Attorney Ducote had proper notice of the contempt allegations against him.

Our review of the record further confirms the court's conclusion that Attorney Ducote was in contempt of the court's orders. With respect to the failure to appear at the July 17, 2023 hearing, the record reflects that Attorney Ducote had definite, clear, and specific notice of the hearing date in advance as well as the requirement that counsel appear to represent Mother at the hearing. The record supports the court's finding that Attorney Ducote knowingly violated the court's order when he chose to wait two weeks to seek a continuance, and failed to attend after his continuance was denied. Attorney Ducote has not established that the trial court abused its discretion in concluding that he acted with wrongful intent when he failed to appear at the hearing. **See In Int. of E.O., supra**. Thus, we see no abuse of the court's discretion in concluding that Attorney Ducote was in indirect criminal contempt when he failed to appear at the hearing.

Finally, we note that Attorney Ducote only developed an argument for his challenge to the first finding of contempt. With respect to the court's remaining findings of contempt, Attorney Ducote's argument in this area is not adequately developed. **See** Pa.R.A.P. 2119(a) (explaining that appellant must support each argument with citation to and discussion of relevant legal authority). Specifically, Attorney Ducote groups the remaining five contempt

filings together and, in one paragraph, states that they must be vacated for lack of notice, reversal is required because there was no definite, clear, specific court orders upon which contempt could be based, alleges there was no supporting evidence or proof, and summarily insists that only the appellate court has jurisdiction to impose sanctions for improper appeals. (**See** Attorney Ducote's Brief at 42-43). Therefore, Attorney Ducote's challenges to the remaining findings of contempt are waived. **See Lackner v. Glosser,** 892 A.2d 21 (Pa.Super. 2006) (explaining appellant's arguments must adhere to rules of appellate procedure, and arguments which are not appropriately developed are waived; arguments not appropriately developed include those where party has failed to cite relevant authority in support of contention). Accordingly, we affirm the November 29, 2023 gag order and the January 11, 2024 order finding Attorney Ducote in contempt; quash the portion of Attorney Ducote and Mother's appeals purporting to challenge the court's denial of recusal; and vacate the December 1, 2023 contempt order.[18]

Orders affirmed in part, vacated in part, and quashed in part.

_____

[18] We note that on January 27, 2025, Mother filed an application for post-submission communication, seeking to notify this Court of the trial court judge's recusal (**see** FN 12, **supra**) in addition to reiterating many of the arguments presented throughout Mother's appeal. Father did not oppose the application. We grant Mother's application for post-submission communication to the extent that we have considered the arguments raised therein.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/8/2025